## STATE OF CONNECTICUT *v.* CHRISTOPHER JENKINS
## (AC 26833)

Schaller, McLachlan and Gruendel, Js.

Argued May 21—officially released November 20, 2007

*Megan Weiss*, certified legal intern, with whom were *Timothy H. Everett*, special public defender, *Michael Hitchery*, certified legal intern, and, on the brief, *Matthew Weiner*, certified legal intern, for the appellant (defendant).

*James M. Ralls*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Paul N. Rotiroti*, assistant state's attorney, for the appellee (state).

### Opinion

McLACHLAN, J. The defendant, Christopher Jenkins, appeals from the judgment of conviction, rendered following his conditional plea of nolo contendere, of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b). On appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence. We agree and reverse the judgment of the trial court.

Our review of the record discloses the following facts relative to the defendant's appeal.[1] On May 7, 2004,

[1] We note that the court did not set forth detailed facts in its written memorandum of decision denying the defendant's motion to suppress. We therefore turn to the evidence adduced at the hearing held with respect to this motion. "We . . . may resort to the evidence produced in support of the court's ruling on a suppression motion when, as here, the court does not make detailed factual findings to support its decision." *State* v. *MacNeil*, 28 Conn. App. 508, 515, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992); see also *State* v. *Owens*, 38 Conn. App. 801, 805, 663 A.2d 1094, cert. denied, 235 Conn. 912, 665 A.2d 609 (1995); *State* v. *Zayas*, 3 Conn.

Michael Morgan, a Newington police detective, was assigned to traffic detail for the purpose of accident reduction and safety on the Berlin Turnpike. At approximately 11:20 p.m., Morgan observed the driver of a Nissan Altima, subsequently identified as the defendant, make two abrupt lane changes in heavy traffic without using a turn signal. On the basis of this observation,[2] Morgan stopped the vehicle.[3] Following his usual procedure, Morgan reported the license plate number of the Altima to a police dispatcher, alerted the dispatcher that he had commenced a traffic stop and provided his location.[4]

Morgan proceeded to the driver's window and asked the defendant to produce his driver's license, vehicle registration and insurance card. After the defendant complied with this request, Morgan returned to his unmarked police vehicle. Morgan characterized the defendant as appearing "unusually nervous compared to someone who's stopped for such a routine traffic

App. 289, 298 n.11, 489 A.2d 380, cert. denied, 195 Conn. 803, 491 A.2d 1104 (1985); *State* v. *Martin*, 2 Conn. App. 605, 614, 482 A.2d 70 (1984), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985).

[2] General Statutes § 14-242 (a) provides: "No person shall turn a vehicle at an intersection unless the vehicle is in a proper position on the highway as required by section 14-241, or turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a highway unless such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner provided in section 14-244."

[3] "A police officer has the right to stop a motor vehicle operating on a Connecticut highway even if the reason for the stop is only an infraction under our traffic laws." *State* v. *Dukes*, 209 Conn. 98, 122, 547 A.2d 10 (1988).

[4] "[S]topping an automobile and detaining its occupants constitute a seizure within the meaning of [the fourth and fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief. *Delaware* v. *Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)." (Internal quotation marks omitted.) *State* v. *Sailor*, 33 Conn. App. 409, 416, 635 A.2d 1237, cert. denied, 229 Conn. 911, 642 A.2d 1208 (1994); *State* v. *Anderson*, 24 Conn. App. 438, 441, 589 A.2d 372, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991).

violation." The defendant produced a New Jersey driver's license and a vehicle rental agreement in lieu of a registration. The vehicle was registered in Pennsylvania. Morgan called in the defendant's information to the dispatcher in order to determine if the license was valid and if there were "any wants, warrants or cautions" associated with the defendant. After learning that the license was valid and that there were no outstanding warrants, Morgan nevertheless requested the defendant's consent to search the vehicle and called another officer for backup assistance.

Morgan proceeded to fill out an infraction ticket for the traffic violation that he had observed. By the time he finished filling out the ticket, Derrick Sutton, a Newington police sergeant, had arrived at the scene. At this point, Morgan returned to the defendant and asked him to get out of the vehicle.[5] Morgan inquired whether the defendant "had anything illegal on him." The defendant responded in the negative. Morgan testified that he did not believe that the defendant was armed. Nevertheless, Morgan searched him but did not find anything illegal on the defendant's person.

After he explained the ticket, Morgan asked the defendant if he had anything illegal in the vehicle. Morgan stated that the basis for this question was the defendant's nervousness, combined with the facts that the rented Altima had a Pennsylvania registration and license plate and that the defendant had a New Jersey driver's license and claimed that he was coming from New York where he had visited his daughter.

The defendant responded to Morgan's inquiry by stating: "[N]ope, just some beer on the passenger seat floor;

[5] Morgan testified that he asked the defendant to get out of the vehicle so that (1) he could show the defendant the traffic ticket and better explain what exactly had happened and (2) he would have the defendant's full attention. Morgan further indicated that this was his usual procedure during traffic stops made on the Berlin Turnpike.

go ahead and check. You can check if you want." Morgan instructed the defendant to move away from the vehicle and to stand with Sutton, behind the Altima. He then began to search the interior of the Altima. He opened the center console and found a package wrapped in white paper. Morgan unwrapped the paper and found a plastic ziplock bag containing a white powder substance that he believed to be cocaine. After Morgan completed his search of the front area of the Altima, the defendant was placed under arrest for possession of cocaine and handcuffed. Following the defendant's arrest, the back area of the Altima and the trunk were searched. A large quantity of heroin and an additional amount of cocaine were found in the trunk.[6]

On July 13, 2004, the defendant filed a motion to suppress all of the evidence seized in the search. The court held an evidentiary hearing on the defendant's motion on December 16, 2004, at which Morgan was the sole witness. On January 14, 2005, the court heard legal arguments from the state and defense counsel. On February 17, 2005, the court issued a memorandum of decision denying the motion to suppress. The court found that "there was no untoward conduct on either the part of . . . Morgan or . . . Sutton [and] that there was no threatening, coercive or overpowering behavior exhibited at any time during this incident." The court further found that "the defendant voluntarily and knowingly gave permission to have his vehicle searched [and that] the defendant never withdrew this consent. "The court did not accept or credit the defendant's claim that his statement to the police that evening was meant only to have the officer look at the beer in his car."

On March 18, 2005, the defendant entered a conditional plea of nolo contendere pursuant to General Statutes § 54-94a[7] to the charge of possession of narcotics

---

[6] A total of 3016 packets of heroin and 5.47 ounces of cocaine was seized from the defendant's vehicle.

[7] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere condi-

with intent to sell by a person who is not drug-dependent. The court sentenced the defendant to twenty years incarceration, execution suspended after eight years, and five years probation. This appeal followed.[8]

The standard of review in connection with the court's denial of a motion to suppress is well settled. As stated by our Supreme Court: "This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 694, 817 A.2d 76 (2003); see also *State* v. *Foote*, 85 Conn. App. 356, 360, 857 A.2d 406 (2004), cert. denied, 273 Conn. 937, 875 A.2d 43, 44 (2005); *State* v. *Carcare*, 75 Conn. App. 756, 764, 818 A.2d 53 (2003).

tional on the right to take an appeal from the court's denial of the defendant's motion to suppress . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress . . . would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ." See also Practice Book § 61-6 (a) (2) (i).

[8] The court made the required finding that the denial of the defendant's motion to suppress was the dispositive issue of the case.

We begin by reviewing the legal principles pertaining to the claims raised on appeal by the defendant. "The Fourth Amendment to the United States constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures. Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Emphasis in original; internal quotation marks omitted.) *State* v. *Badgett*, 200 Conn. 412, 423, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

"A warrantless search . . . is not unreasonable, however, under the fourth amendment to the United States constitution . . . when a person with authority to do so has freely consented. . . . It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search [or seizure] that is conducted pursuant to consent. . . . Whether a defendant has voluntarily consented to a search is a question of fact to be determined from the totality of the circumstances. The trial court makes this determination on the basis of the evidence that it deems credible along with the reasonable inferences that can be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Wragg*, 61 Conn. App. 394, 401, 764 A.2d 216 (2001); see also *State* v. *Azuka*, 278 Conn. 267, 275, 897 A.2d 554 (2006).

The defendant claims that the court improperly denied his motion to suppress evidence. Specifically, he argues that (1) even if his consent to search the vehicle had been voluntary, it was tainted by a prior, unconstitutional search of his person, (2) the state failed to establish that he actually consented to the

search of the vehicle, (3) any consent to search was not given voluntarily and (4) any consent to search was obtained by a violation of the Connecticut constitution by the police improperly converting a traffic stop into a criminal investigation. We conclude that the defendant was unlawfully detained, that his consent to search the vehicle was tainted by that illegal detention and that the state failed to purge the taint of the illegal detention. For those reasons, the evidence procured through the defendant's consent should have been suppressed.

The defendant argues that even if he had voluntarily consented to the search of his vehicle, any evidence found was tainted as a result of the illegal search of his person that occurred prior to the search of the vehicle.[9] The state contends that this claim is being raised for the first time on appeal and is, therefore, unreviewable. The state further argues that the record is inadequate for review pursuant to the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

With respect to the defendant's preservation of this issue and its reviewability, this claim formed the heart of the defendant's motion to suppress, filed in the trial

[9] "[T]he exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). [T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures. *United States* v. *Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). To carry out this purpose adequately, the rule does not distinguish between physical and verbal evidence; see *Wong Sun* v. *United States*, supra, 485–86; nor does it apply only to evidence obtained as a direct result of the unlawful activity. See *Nardone* v. *United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). Rather, the rule extends to evidence that is merely derivative of the unlawful conduct, or what is known as the fruit of the poisonous tree." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 189, 811 A.2d 223 (2002); see also *State* v. *Hammond*, 257 Conn. 610, 626–27, 778 A.2d 108 (2001).

court, in which he claimed that the officer "illegally detained the defendant for an extended period without probable cause or a reasonable and articulable suspicion . . . ." On appeal, the defendant first raises this issue within his voluntariness claim by arguing that "[t]he traffic stop . . . should have ended after Detective Morgan explained the traffic infraction to the defendant, at which time [Morgan] should have given him the traffic ticket and returned his documentation to him. Instead, the seizure of the defendant was extended even though the stop at its inception was justifiable only as a traffic stop and that the police had developed neither probable cause nor reasonable and articulable suspicion of criminal activity."

Further, the second assignment of error in the defendant's brief sets forth the issue of "[w]hether the police violated the Connecticut [c]onstitution by converting a traffic stop into a criminal investigation in which the defendant was detained by two officers in two police vehicles and searched without justification before he 'consented' to the search of his car." Within this claim, the defendant cites the dissent in *Ohio* v. *Robinette*, 519 U.S. 33, 51, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (Stevens, J., dissenting), for the proposition that when an officer completes the task of either arresting or reprimanding the driver of a speeding car, the officer's continued detention of that person constitutes an illegal seizure.

Finally, the defendant's reply brief properly sets forth the claim that the search of his car during an extension of a routine, noncriminal traffic stop was unconstitutional. Thus, although the defendant, within the fruit of the poisonous tree analysis in his main appellate brief, argues that his consent to search the car was the product of the illegal search of his person, he neither limited his tainted consent claim to that sole issue nor

abandoned his claim that the detention was unreasonably prolonged.[10]

It is axiomatic that "[t]*he scope of [an investigative] detention must be carefully tailored to its underlying justification [and the] investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.*" (Emphasis added.) *Florida* v. *Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Thus, a stop pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), "that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. . . . Like the determination of the initial justification, this inquiry is fact-bound. . . . The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. . . . If . . . the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances. . . . One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to

---

[10] For the foregoing reasons, we disagree with the dissent's conclusion that the defendant did not brief adequately the issue of whether the purpose of the traffic stop had been effectuated.

We also note that the defendant briefed his state constitutional claim in some detail, asking this court to adopt a four-pronged rule that he claims naturally follows from the holding in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992). Although we decline his invitation to do so, we mention this argument to demonstrate that the defendant did provide analysis and case law in his appellate brief in support of this claim.

Although the claim may not have been briefed as clearly and explicitly as the dissent preferred, we conclude that it has been incorporated in the defendant's claims from the time he argued his motion to suppress through the presentation of his issues on appeal.

check a description or an identification, so long as his conduct is strictly tied to and justified by the circumstances which rendered its initiation permissible. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends on a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." (Citations omitted; internal quotation marks omitted.) *State* v. *Casey*, 45 Conn. App. 32, 40–41, 692 A.2d 1312, cert. denied, 241 Conn. 924, 697 A.2d 360 (1997).

In determining if a seizure has exceeded the scope of a permissible motor vehicle stop, the court must determine whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the interference in the first place. See *State* v. *Carcare*, 75 Conn. App. 756, 767, 818 A.2d 53 (2003); see also *United States* v. *Jones*, 234 F.3d 234, 240–41 (5th Cir. 2000) (holding that although initial stop of defendants' vehicle for speeding was valid, continued detention, after completing computer check on drivers' licenses and rental papers revealed clean records, was unreasonable and violated fourth amendment). With respect to whether the results of the initial stop aroused further suspicion warranting a prolonged inquiry, "[t]he police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *State* v. *Hammond*, 257 Conn. 610, 617, 778 A.2d 108 (2001).

Here, Morgan stopped the defendant's vehicle because he observed the vehicle making illegal lane changes. The defendant does not contest the validity of the initial stop. Rather, the defendant's relevant claim

on appeal relates to whether Morgan improperly expanded the scope of the stop by questioning the defendant about whether he was engaged in unrelated illegal activity and then performing a search of the defendant's person[11] and his car, after the initial purpose for effectuating the stop had been achieved.

The initial purpose of the stop had been achieved.[12] Morgan did not embark on his inquiry into whether the

[11] The state is correct that the issue of whether the defendant's person was illegally searched was not raised in the trial court and that the record is inadequate to establish whether the defendant consented to the search of his person. Moreover, even if we assume arguendo that an illegal search of the defendant's person occurred, this, in an of itself, does not necessarily invalidate the search of the defendant's car. See 3 W. LaFave, Search and Seizure (3d Ed. 1996) § 8.2 (d), pp. 663–64 ("if the police have made a search which did *not* result in the finding of incriminating evidence against the person from whom consent is sought to continue the search on the same occasion, the illegality of the first search will not necessarily invalidate the consent given by one who knows that the police do not claim any authority to continue the search without consent" [emphasis in orignal]). Nevertheless, as discussed herein, the fact that the defendant was patted down prior to the search of his car is relevant to whether his consent was tainted.

[12] This is not a factual finding but, rather, is a legal conclusion based on the facts contained in the record. We note that in addressing the issue of when a traffic stop had been completed, the courts in the federal cases and cases from other jurisdictions cited by the dissent reached their conclusions as to whether the purpose had been effectuated only after reviewing the facts and circumstances of each case. That is what we have done in this case.

We agree with the dissent that no appellate case law in Connecticut has considered the question of when the purpose of a traffic stop has been achieved. Nevertheless, we can make that determination, as the courts in other jurisdictions have done, by reviewing the facts and circumstances of this case.

The dissent concludes that the defendant failed to provide an adequate record to review this claim. We disagree. As we have noted in this opinion: (1) the defendant was stopped for a traffic infraction; (2) the officer checked the defendant's license and registration and determined that there were no outstanding warrants for him; (3) the officer reviewed the car rental agreement and found nothing suspicious; and (4) the officer had written the traffic ticket and then asked the defendant to exit the vehicle so the officer could explain the ticket to him. Only after all that had occurred did the officer ask the defendant if he had anything illegal in his vehicle. The officer indicated that he made this inquiry because the defendant had appeared nervous. The record is sufficient to make the conclusion that, under these circumstances, the purpose for which the stop had been made had been effectuated.

We decline to adopt a bright line test for such a determination. A trial court, in making such a determination, would have to consider the totality

defendant was engaged in other illegal activity until *after* Morgan had (1) completed a check of the defendant's license and determined that it was valid and that there were no outstanding warrants for him, (2) examined the car rental agreement and determined that it appeared in order and that the time frame for the rental was valid and (3) returned to the defendant's vehicle, had him exit the vehicle and explained the traffic ticket to the defendant.[13] Accordingly, the record clearly reveals that Morgan's inquiry into other suspected illegal activity came after Morgan's purpose for effectuating the stop had been achieved.

We reject the state's argument that the record is inadequate on the issue of whether Morgan had returned

of the circumstances in each case. Whether the driver's license or ticket had been turned over to the individual would be only one factor. It should not be the determinative factor because, otherwise, an officer could wrongfully detain that person by purposefully withholding those items in order to make impermissible inquiries. For discussion of this issue, see *State* v. *Thompson*, 284 Kan. 763, 166 P.3d 1015 (2007).

We finally note, in connection with the dissent's conclusion that the record was inadequate for review, that it is the state's burden to prove that the search and seizure of an individual were constitutional. The defendant, however, has raised issues on appeal and has the responsibility to provide an adequate record. A review of the file reveals that he filed a motion for articulation with the trial court, comprised of several questions, requesting additional articulation of the factual and legal basis for the denial of his motion to suppress. The court denied the motion for articulation. The defendant filed a motion for review of that decision with this court, which motion was granted, but the relief requested was denied. The defendant, therefore, did all that he could to perfect the record.

[13] Specifically, Morgan, during the state's direct examination, testified as follows:

"[The Prosecutor]: [*O*]*nce you had explained the ticket to* [*the defendant*], did you ask him a question?

"[The Witness]: Yes, I did. . . .

"[The Prosecutor]: And what did you ask him?

"[The Witness]: I asked him if he had anything illegal in the vehicle." (Emphasis added.)

Later in the hearing, Morgan made it clear that the question regarding other illegal activity came *after* he had explained the ticket to the defendant. On cross-examination, Morgan testified as follows:

"[Defense Counsel]: All right. So, you were standing there with him, showing him the ticket, going over it. Was that before or after you asked if he had anything illegal in his car?

"[The Witness]: *That's before.*" (Emphasis added.)

the defendant's license to him prior to questioning him about other illegal activity and that it would, therefore, be sheer speculation to conclude that the initial purpose of the stop had been achieved. First, the testimony of Morgan and the court's memorandum of decision do not support that position. When asked whether he had handed the defendant the ticket at the time he asked him about other illegal activity, Morgan stated: "I don't think I did." In its memorandum of decision, the court did not discredit the defendant's claim that he remained seized at the time the officer asked him for consent. As the court explained, "[e]ven crediting the defendant's claim that he remained 'seized' because the detective had not handed him his motor vehicle ticket, this court does not find this to be dispositive in determining the voluntariness of the defendant's consent."

Second, even if the record is not absolutely conclusive with regard to whether the license and traffic citation were handed to the defendant prior to the additional unrelated questioning by Morgan, any inadequacy in the record should be charged to the state because it bore the burden at the suppression hearing to establish that fact.[14] See *United States* v. *Santiago*, 310 F.3d 336, 343 n.4 (5th Cir. 2002) ("It is unclear from the record whether [the officer] handed back the vehicle registration as he testified that he received the registration but also stated that he did not seize the registration. However, there is no evidence in the record that [the officer] handed back the driver's licenses. Additionally, at oral argument, counsel for both sides were asked whether the licenses were returned and what evidence was in the record indicating such. Neither side could recall the presence of any evidence indicating that the licenses were returned. As we have already stated . . .

[14] See *State* v. *Clark*, 255 Conn. 268, 291, 764 A.2d 1251 (2001) ("[t]he state bears the burden of proving that an exception to the warrant requirement applies when a warrantless search has been conducted").

however, the burden was upon the government to show the admissibility of evidence procured by the search, i.e. that the search and seizure were [c]onstitutional and that the consent was voluntary.").

Third, to conclude that the record is inadequate on this issue creates the implication that a police officer, during a routine motor vehicle stop made on the basis of a driving infraction, is authorized to make arbitrary requests for consent searches that are wholly unrelated to the initial purpose of the stop and unsupported by additional suspicion justifying the expansion of the stop, so long as the officer chooses not to conclude the encounter. Such a blanket authorization is contrary to our search and seizure jurisprudence, which generally proscribes such arbitrary conduct on the part of the police. See *State* v. *Nash*, 278 Conn. 620, 631, 899 A.2d 1 (2006) ("[t]he police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries" [internal quotation marks omitted]).

Moreover, to conclude otherwise also creates an implication that, during a routine motor vehicle stop, a defendant may not contest the validity of a consent to search unless the officer's request for consent occurs *after* the officer has returned the defendant's license and the ticket. In *State* v. *Story*, 53 Conn. App. 733, 741, 732 A.2d 785, cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999), this court concluded that a police officer's request for consent to search on the basis of nothing more than a hunch was not improper because the officer did not request the consent to search until *after* the stop had concluded and the defendant was free to leave at the time of the request. Mindful of *Story*, if we now sanction arbitrary requests for consent searches by the police *prior* to the conclusion of a stop, we effectively close the door on a criminal defendant's ability ever to

contest the validity of a consent to search during a motor vehicle stop.

On the basis of the record, we conclude that Morgan's inquiry as to whether the defendant was engaged in illegal activity went beyond the scope of the traffic stop and occurred at a time when the stop *reasonably should have ended.* Having reached that conclusion, we now must determine whether Morgan had reasonable, articulable suspicion to expand the scope of the stop by questioning the defendant about illegal activity unrelated to the purpose of the underlying stop. See *United States* v. *Santiago,* supra, 310 F.3d 341–42 ("Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. . . . In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." [Citation omitted.]).

Morgan testified that he decided to seek consent to search the defendant's car because the defendant had "appeared to be unusually nervous compared to someone who's stopped for such a routine traffic violation . . . . At that point, based upon the suspicion that I had already gathered during my initial contact, I decided that [I was] probably going to ask for consent to search the vehicle." Morgan also called for backup assistance on the basis of those observations. Further, Morgan testified that he decided to expand his inquiry to investigate other potential illegal activity on the basis of the defendant's nervousness, the car registration and license plates, and because the defendant told him that he was returning from New York.

At the suppression hearing, it was established that many of Morgan's stated concerns were quickly dispelled. For example, on cross-examination, Morgan

conceded that it was not unusual that a rental vehicle would be registered in a state other than the home residence of the driver. Morgan further testified that the defendant's license was determined to be valid and that he had no information that the defendant was, or had been, involved in any criminal activity other than the traffic violation.

Moreover, the state did not establish a predicate at the suppression hearing for the court to draw the conclusion that the defendant's unusual nervousness, combined with those other factors, justified an expansion of the scope of the stop. Morgan offered no testimony that he had specific training in narcotics interdiction, that the area on the highway was a high crime area or an area common to drug traffickers, or that the defendant's actions were consistent with criminal activity such as those exhibited by a drug courier. Compare, e.g., *State v. Van Der Werff*, 8 Conn. App. 330, 332, 513 A.2d 154 ("[the officer testified that he] believed that the defendant's nervous mannerisms matched the so called 'drug courier profile,' a group of characteristics developed by law enforcement agencies and used to identify persons who illegally transport narcotics along the nation's airways"), cert. denied, 201 Conn. 808, 515 A.2d 380 (1986), citing *United States* v. *Mendenhall*, 446 U.S. 544, 547 n.1, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); and *State* v. *Nash*, supra, 278 Conn. 634 ("In the matter presently before us, the trial court found that [the officers] had extensive experience and training in narcotics investigation and enforcement. The court credited the officers' testimony that: the stop had taken place in a high crime area at approximately 5 p.m. in March; they had observed the defendant engaged in hand-to-hand exchanges on two separate occasions; this behavior was consistent with narcotics transactions in which the defendant was a dealer; and narcotics dealers often are armed and work with others who are in the immediate

vicinity. The court also found that the defendant immediately upon being stopped had engaged in verbal resistance toward the officers."). Thus, other than the bald assertion that the defendant was unusually nervous, the state, which bore the burden of proof at the suppression hearing, offered nothing to substantiate that reasonable suspicion existed to allow Morgan to expand the scope of the stop.

Reviewing the evidence presented by the state, we conclude that it did not establish that Morgan had reasonable suspicion to expand the scope of the stop into an inquiry of whether the defendant was engaged in illegal activity unrelated to the underlying stop or that Morgan was proceeding on anything more than a mere hunch. Therefore, once Morgan began to question the defendant about unrelated illegal activity, the formerly valid motor vehicle stop morphed into an illegally prolonged seizure of the defendant. See *United States* v. *Santiago*, supra, 310 F.3d 338, 342 (unreasonable for officer to detain suspect after records check was completed on basis of "extreme nervousness").

This court having concluded that Morgan unlawfully detained the defendant, the next relevant question is what effect, if any, the defendant's continued and unlawful detention had on his subsequent consent to search his vehicle. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . All evidence is not, however, a fruit of the poisonous tree simply because it would not have been discovered but for the illegal action of law enforcement officials. . . . Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. . . . The initial determination is, therefore, whether the

challenged evidence is in some sense the product of illegal government activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 99 Conn. App. 413, 426–27, 914 A.2d 592, cert. granted on other grounds, 282 Conn. 909, 922 A.2d 1099 (2007).

In determining whether the defendant's consent was voluntary, we must address the issue of whether his consent was tainted by the illegal detention. "The voluntary consent of [a witness] is only a threshold requirement in determining whether [seized evidence] is a tainted fruit of the alleged prior illegality. In *Brown* v. *Illinois*, 422 U.S. 590, 603, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), the United States Supreme Court rejected the idea that a confession resulting from an illegal arrest is untainted simply because it is 'voluntarily' given. It follows from *Brown* that the mere fact a consent to a search or seizure is voluntary does not necessarily remove the taint." *State* v. *Cates*, 202 Conn. 615, 621, 522 A.2d 788 (1987); see also *United States* v. *Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (noting in addition to proving voluntariness, "[w]e require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule").

In determining whether the state has purged the taint of an unlawful detention followed by a consent to search, the factors considered relevant by the United States Supreme Court are (1) the temporal proximity between the police illegality and the consent to search, (2) the presence of intervening circumstances and (3) the purpose and flagrancy of the official misconduct. See *Brown* v. *Illinois*, supra, 422 U.S. 603–604; *State* v. *Cates*, supra, 202 Conn. 621.

Turning to the first factor, "[c]ourts have frequently held that a purportedly voluntary consent given after an illegal arrest or search is nonetheless a tainted fruit when that consent was given very soon after the illegal police action." *State* v. *Cates*, supra, 202 Conn. 621. Here, there is absolute temporal proximity between the unlawful detention and the defendant's consent because he gave his consent *while* he was unlawfully detained.[15] With respect to the second factor, Morgan testified that he did not inform the defendant of his right to refuse consent, which may have purged the taint of the unlawful detention and supported the conclusion that the consent was an act of free will. Compare *United States* v. *McGill*, 125 F.3d 642, 644 (8th Cir. 1997) (concluding that defendant's understanding of his right to refuse consent was intervening circumstance), cert. denied, 522 U.S. 1141, 118 S. Ct. 1108, 140 L. Ed. 2d 161 (1998). Regarding the third factor, Morgan testified that he conducted a patdown search of the defendant although he did not believe that the defendant was armed. While the record is inadequate to determine whether the defendant's person was illegally searched, it is disconcerting that the officer testified that he conducted such a patdown without any justifiable basis. See *State* v. *Nash*, supra, 278 Conn. 632 (police officer may only undertake patdown if, during course of lawful investigatory detention, officer reasonably believes that detained individual might be armed and dangerous).

Accordingly, given the circumstances of this case, we conclude that the state failed to purge the taint of the defendant's unlawful detention and that the evidence procured through his consent should be suppressed.

[15] See, e.g., *State* v. *Hight*, 146 N.H. 746, 750, 781 A.2d 11 (2001) (finding absolute temporal proximity between unlawful detention and defendant's consent, which was given while defendant was unlawfully detained, in making determination that consent search was tainted by unlawful extension of traffic stop to question defendant about drugs).

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress and for further proceedings in accordance with law.

In this opinion GRUENDEL, J., concurred.

SCHALLER, J., dissenting. The majority concludes that the defendant, Christopher Jenkins, was detained unlawfully and that the improper detention tainted his subsequent consent to search his vehicle. I respectfully disagree with this conclusion. In my view, the defendant has failed to provide an adequate record to review this claim. Moreover, the defendant has not briefed adequately the issue of whether the purpose of the traffic stop had been effectuated. I am unable to reach the issue of whether the defendant's consent was tainted by an illegal seizure. Because I am not persuaded by the defendant's remaining claims, I would affirm the judgment of the trial court.

I

At the outset, I note my agreement with the factual and procedural history as set forth in the majority opinion. In order to explain my disagreement, however, it is useful to expand briefly on some of these details. On July 13, 2004, the defendant moved to suppress, as the fruits of an illegal search, all evidence seized from the traffic stop that occurred on May 7, 2004. Specifically, the motion stated: "Once the traffic citation was issued, the officer illegally detained the defendant for an extended period without probable cause or a reasonable and articulable suspicion that the defendant was engaged in illegal activity which resulted in an illegal seizure."

At the suppression hearing, Michael Morgan, a Newington police detective, testified as to the events of May

7, 2004. After filling out the infraction for the motor vehicle violation that he had witnessed, he asked the defendant to step outside of his vehicle. During their interaction, Morgan asked the defendant if there was anything illegal in the vehicle. The defendant stated that there was nothing illegal in the vehicle, just some beer on the floor, and then granted Morgan permission to search the vehicle.[1]

During cross-examination, the following colloquy occurred between defense counsel and Morgan:

"Q. Incidentally, after you explained the ticket to [the defendant], did you go over it with him and show him and what he had to do, how he had to deal with it or no?

"A. I told him what it was for and the fact that he had to mail it in by whatever the answer date was. I don't recall it.

"Q. All right. So, you were standing there with him, showing him the ticket, going over it. Was that before or after you asked if he had anything illegal in his car?

"A. That's before."

On January 10, 2005, the defendant filed a memorandum of law in support of his motion. Specifically, he argued that "(1) the detention of the defendant exceeded the scope of the justification for the initial stop, (2) the defendant did not freely and voluntarily consent to the search of his vehicle, and, alternatively, (3) even if the defendant's alleged 'consent' was free and voluntary and could be interpreted as permission,

---

[1] "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." (Internal quotation marks omitted.) *United States* v. *Weaver*, 282 F.3d 302, 309–10 (4th Cir.), cert. denied, 537 U.S. 847, 123 S. Ct. 186, 154 L. Ed. 2d 75 (2002); see also *Immigration & Naturalization Service* v. *Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984).

it was limited in scope and cannot justify a wholesale search as occurred here."

On January 14, 2005, the court heard argument with respect to the defendant's motion. During this proceeding, the court stated: "My understanding of the facts are that once he stepped out of the car, *but before the ticket was issued to him,* he was asked to give consent. Is that correct? Is that your reading of the facts of the case?" (Emphasis added.) The prosecutor responded that he believed that the court was correct.[2]

On the basis of this minimal record, the majority determines that "[t]he initial purpose of the stop had been achieved." I cannot conclude, on the basis of this record, that the trial court made such a finding. It is not our province to do so. "No citation is needed for the fundamental principle that as an appellate tribunal, this court cannot find facts." (Internal quotation marks omitted.) *Gibson* v. *Commissioner of Correction,* 98 Conn. App. 311, 318 n.5, 908 A.2d 1110 (2006), cert. denied, 281 Conn. 908, 916 A.2d 49 (2007).[3]

Moreover, I do not believe that the record is adequate for us to review the issue of whether the purpose of the traffic stop had been completed. The vague and ambiguous record before us invites speculation. For reasons that I will point out, making this determination without either a proper record or clear standards will produce uncertainty in the trial courts. "It is well settled that it is the duty of the appellant to provide this court

---

[2] I further note that in his appellate brief, the defendant states that "[h]e was never handed an infractions ticket."

[3] I note that in *People* v. *Cervantes-Arredondo,* 17 P.3d 141, 148 (Colo. 2001), the Colorado Supreme Court noted that the trial court had failed to make findings about whether the officer had returned the defendant's license and registration to him and remanded the case with instruction for the court to make such findings. In others words, the presence of these facts is of critical importance.

with an adequate record to review his claims. See Practice Book §§ 60-5 and 61-10. Accordingly, [a] lack of pertinent factual findings and legal conclusions will render a record inadequate. . . . *State* v. *Gasser,* 74 Conn. App. 527, 535, 812 A.2d 188, cert. denied, 262 Conn. 954, 818 A.2d 781, cert. denied, 540 U.S. 823, 124 S. Ct. 153, 157 L. Ed. 2d 43 (2003)." (Internal quotation marks omitted.) *State* v. *Sargent,* 87 Conn. App. 24, 30, 864 A.2d 20, cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005); see also *State* v. *Lugo,* 266 Conn. App. 674, 685, 835 A.2d 451 (2003).

Our decision in *State* v. *Thompson,* 46 Conn. App. 791, 700 A.2d 1198 (1997), is particularly instructive. In that case, two Hartford police officers observed the defendant and another individual selling drugs. Id., 792–93. The defendant moved to suppress the seized crack cocaine and currency on the ground that he had been arrested without probable cause. Id., 794. The trial court denied the motion. Id., 795. On appeal, the defendant again claimed that he had been arrested without probable cause and that crack cocaine and currency were seized in violation of his constitutional rights. Id. We declined to review this claim on appeal. Id., 796. "[W]e cannot address the issues the defendant raises on appeal because we do not have any findings or conclusions of law by the trial court on a number of important factors. Specifically, we do not have before us a finding by the trial court of when the valid arrest of the defendant occurred, at the point when he was initially detained or after the crack cocaine was found. We also do not have a finding of whether the defendant had a reasonable expectation of privacy in the planter in which the crack cocaine was found. Finally, we do not have a finding of whether the seizure of the currency occurred before or after the valid arrest. Because the record is inadequate, we decline to review this claim." Id., 795–96.

The record in the present case is similarly devoid of certain important factors. It is not clear whether Morgan had finished explaining the ticket to the defendant. It is uncertain whether Morgan had returned the defendant's license or registration. It is uncertain whether the defendant had any questions regarding the traffic citation. As I explain more fully in part II, these are critical matters that courts use to determine whether the purpose of a traffic stop has been completed. Simply put, I believe that making a determination without this information is speculation, and I would decline to review this claim.

## II

In addition to the problems of the lack of a finding by the trial court and an inadequate record, I also conclude that the defendant failed to brief adequately the issue of whether Morgan unconstitutionally extended the traffic stop. In my view, the defendant merely assumes, without citation or analysis, that the purpose of the traffic stop had been effectuated. Because this issue was not briefed properly, I would conclude that it was abandoned by the defendant and cannot serve as the basis for reversing the judgment of the trial court.

In his brief, the defendant argues that "[t]he traffic stop . . . should have ended after . . . Morgan explained the traffic infraction to the defendant, at which time [Morgan] should have given him the traffic ticket and returned his documentation to him. . . . Extending the traffic stop and withholding the traffic ticket from the defendant signaled in no uncertain terms that the defendant was being held for more than a traffic stop—despite the inability of the police to justify any intrusion outside the scope of the traffic stop."[4] Other

[4] The defendant argues that Morgan impermissibly expanded the *scope* of the traffic stop. It does not appear, however, that the defendant claims that Morgan's inquiry improperly extended the *duration* of the stop. See, e.g., *United States* v. *Rivera*, 906 F.2d 319, 322 (7th Cir. 1990) (determination of propriety of investigative detention after traffic stop involves inquiry as

than a passing reference to Justice Stevens' dissent in *Ohio* v. *Robinette*, 519 U.S. 33, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996), the defendant's brief does not address the issue of whether the purpose of the traffic stop had been effectuated.

"This court is not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . *State* v. *Colon*, 272 Conn. 106, 153 n.19, 864 A.2d 666 (2004)." (Internal quotation marks omitted.) *State* v. *Bermudez*, 95 Conn. App. 577, 580 n.2, 897 A.2d 661 (2006); see also *State* v. *Carpenter*, 275 Conn. 785, 826, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006); *State* v. *Pink*, 274 Conn. 241, 256, 875 A.2d 447 (2005). "[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *State* v. *John G.*, 100 Conn. App. 354, 356 n.2, 918 A.2d 986, cert. denied, 283 Conn. 902, 926 A.2d 670 (2007); see also *State* v. *Johnson*, 82 Conn. App. 777, 790, 848 A.2d 526 (2004); *State* v. *Thompson*, 71 Conn. App. 8, 15 n.5, 799 A.2d 1126 (2002).

---

to duration and scope). I further note that the majority's analysis appears to focus on the issue of the scope rather than duration.

The crux of the majority's reasoning appears to be that, although Morgan's initial stop for a traffic violation was constitutional, once the purpose of that stop was completed, any further detention constituted an illegal seizure and, therefore, was impermissible. It then concludes that this improper seizure tainted the defendant's subsequent consent. In my view, it cannot be determined whether the purpose of the traffic stop was completed, and, therefore, there is no "second" impermissible seizure. Accordingly, there is no tainted consent that warrants a reversal of the trial court's conclusion.

I am mindful that "[t]he scope of [an investigative] detention must be carefully tailored to its underlying justification [and the] investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida* v. *Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Nevertheless, neither this court nor our Supreme Court has considered the question of when the purpose of a traffic stop has been achieved. Simply put, no appellate decision in this state has established, as a matter of law, when a traffic stop is completed.[5] Indeed, the defendant acknowledged as much in his brief. Despite this observation, the defendant simply concludes that the traffic stop ended after Morgan explained the ticket to him. Absent a thorough and complete presentation of this issue by the parties in their briefs, I am unwilling to accept the conclusion urged by the defendant. I believe that before we enter an uncharted area of search and seizure jurisprudence and establish a rule that, subject to review by our Supreme Court, will bind all of our

[5] I note that in his dissenting opinion in *State* v. *Story*, 53 Conn. App. 733, 744, 732 A.2d 785 (*Hennessy, J.*, dissenting), cert. denied, 251 Conn. 901, 738 A.2d 1093 (1999), Judge Hennessy indicated that a traffic stop was complete when the officer returned the driver's paperwork and issued him a citation. The majority opinion in *Story*, however, did not address the issue of when a traffic stop has been completed.

trial courts, we should have the benefit of both a proper record and thorough analysis by the parties.

Moreover, it does not follow, a fortiori, that merely explaining the ticket to a driver signals the end of the traffic stop. My research reveals that various approaches to this issue exist in both our sibling jurisdictions and the federal courts. For example, in *Ferris v. State*, 355 Md. 356, 362, 735 A.2d 491 (1999), the defendant was stopped by a Maryland state police trooper for speeding. The defendant complied with the trooper's request to see his driver's license and registration. The trooper completed the citation form and provided it to the defendant, who signed it. Id., 363. The trooper then returned the signed copy of the citation, the driver's license and registration to the defendant. Id. At that point, the trooper began to ask the defendant questions, which led to his admission that he was in possession of marijuana. Id., 363–64.

After his motion to suppress had been denied, the defendant appealed. Id., 366. The Maryland Court of Appeals stated that it had not "had occasion to consider the question of the extent to which a law enforcement officer who has properly stopped a motor vehicle based on probable cause may detain and question the driver after the officer has concluded the purpose for the initial stop." Id., 370. It noted the decisions of Maryland's intermediate appellate court that held that once the purpose of the initial stop had been concluded, by issuing a warning or citation to the driver, further detention was not permitted. The Court of Appeals concluded, "after considering all of the circumstances of the initial encounter between [the trooper] and [the defendant], that *the traffic stop essentially came to an end upon the trooper's delivery of the citation, and return of the driver's license and registration.* Once [the defendant]

signed and returned the citation [to the officer] in compliance with Maryland traffic laws . . . he had completed all his duties pertaining to the traffic stop itself. Because the traffic stop had ended there, [the defendant] was lawfully free to drive away . . . ." (Citation omitted; emphasis added.) Id., 373. The end point of the traffic stop, therefore, was the delivery of the citation and the return of the driver's documents. The Court of Appeals ultimately concluded that, under the totality of the circumstances, a reasonable person in the position of the defendant would not have felt free to leave and therefore was seized for purposes of the fourth amendment. Id., 378–79. In other words, there were two seizures, one for the traffic violation, which was proper, and a second, after the purpose of the traffic stop had been completed, which was improper. Id., 384; cf. *Commonwealth* v. *Strickler*, 563 Pa. 47, 757 A.2d 884 (2000) (although no express endpoint to first lawful detention, such endpoint existed and officer confined subsequent interaction with defendant in manner consistent with consensual encounter).

As a matter of state constitutional law, the Minnesota Supreme Court held that evidence obtained as a result of a search based on consent obtained during an impermissibly expanded traffic stop is subject to suppression. In *State* v. *Fort*, 660 N.W.2d 415, 416 (Minn. 2003), the defendant was a passenger in a motor vehicle that was stopped for speeding and having a cracked windshield. After the police officers determined that neither the defendant nor the driver had a valid driver's license, they elected to have the vehicle towed. Id., 417. As the defendant exited the vehicle, he was questioned about drugs and weapons, and he eventually stated that he *would not mind if the officers searched the vehicle.* Id. In concluding that the motion to suppress filed by the defendant should have been granted, the court stated:

"While there is nothing improper in the record to suggest that the initial stop was improper, *the scope and duration of a traffic stop must be limited to the justification for the stop.* . . . The purpose of this traffic stop was simply to process violations for speeding and a cracked windshield and there was no reasonable articulable suspicion of any other crime. Investigation of the presence of narcotics and weapons had no connection to the purpose for the stop. We therefore conclude that the investigative questioning, consent inquiry, and subsequent search went beyond the scope of the traffic stop and was unsupported by any reasonable articulable suspicion." (Citation omitted; emphasis added.) Id., 418–19; see also *State* v. *Hight*, 146 N.H. 746, 781 A.2d 11 (2001).[6]

In the *Ferris* case, the Maryland Court of Appeals concluded that the initial seizure, based on the traffic violation, was completed when the defendant received the citation and the police officer returned his license and registration. The court concluded that following the return of the license and registration, an unconstitutional seizure occurred when the officer began questioning the defendant because, at that point, the officer

---

[6] I note that the United States Court of Appeals for the Seventh Circuit has stated: "If the police may ask (without suspicion) questions of persons who are in no custody (e.g., walking down the street), people who are in practical but not legal custody (e.g., passengers on busses and airplanes), and people who are in formal custody pending trial or following conviction . . . then why would the police need probable cause or reasonable suspicion to direct questions to persons . . . who are in legal custody but likely to be released soon? To say that questions asked of free persons and questions asked of prisoners are not seizures but that questions asked of suspects under arrest *are* seizures would have neither the text of the Constitution behind it nor any logical basis under it." (Emphasis in original; internal quotation marks omitted.) *United States* v. *Childs*, 277 F.3d 947, 951 (7th Cir.) (en banc), cert. denied, 537 U.S. 829, 123 S. Ct. 126, 154 L. Ed. 2d 43 (2002). The court indicated that "[i]t is difficult to see why custody should turn an inquiry into a 'seizure.'" Id., 950. In the view of the majority of the Seventh Circuit, a question asked during a traffic stop that is unrelated to the purpose of the traffic stop is not absolutely forbidden by the constitution. Id., 954.

lacked either probable cause or a reasonable articulable suspicion. It was this improper seizure that tainted the defendant's consent. In contrast, in *Fort*, the Minnesota Supreme Court concluded that it was the questioning of the defendant about a matter unrelated to the purpose of the traffic stop that was improper.

Additionally, I note that the United States Court of Appeals for the Tenth Circuit has stated that "[t]his Circuit follows the brightline rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him." *United States* v. *Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.), cert. denied, 511 U.S. 1095, 114 S. Ct. 1862, 128 L. Ed. 2d 484 (1994), overruled in part on other grounds by *United States* v. *Flowers*, 441 F.3d 900, 903 n.1 (10th Cir. 2006); *United States* v. *Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996); see also *Daniel* v. *State*, 277 Ga. 840, 843, 597 S.E.2d 116 (2004). In *United States* v. *Beck*, 140 F.3d 1129, 1135 (8th Cir. 1998), the court indicated that the defendant was not seized for the purposes of the constitution after his paperwork had been returned and the officer told him that he was "free to go." See also *United States* v. *Flores*, 474 F.3d 1100, 1103–1104 (8th Cir. 2007); *United States* v. *Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (traffic stop concluded when officer handed driver citation and shook his hand); *United States* v. *Meikle*, 407 F.3d 670, 673 (4th Cir. 2005) (after papers had been returned to defendant and he was told he was free to go, further interaction between officer and defendant was consensual); *United States* v. *Rusher*, 966 F.2d 868, 877 (4th Cir.) (same), cert. denied, 506 U.S. 926, 113 S. Ct. 351, 121 L. Ed. 2d 266 (1992). In *United States* v. *Dortch*, 199 F.3d 193, 199 (5th Cir. 1999), and *United States* v. *Jones*, 234 F.3d 234, 241 (5th Cir. 2000), the United States Court of Appeals for the Fifth Circuit focused its analysis on

whether the computer check of the defendant and documents had been completed. The United States Court of Appeals for the Eleventh Circuit, in *United States* v. *Purcell*, 236 F.3d 1274, 1282 (11th Cir.), cert. denied, 534 U.S. 830, 122 S. Ct. 73, 151 L. Ed. 2d 38 (2001), stated that the issue of whether the officer had returned the license to a motorist was a factor in the totality of circumstances with respect to the issue of consent, but was not a "litmus test . . . ."

These cases demonstrate that no clear and well established fourth amendment jurisprudence as to when the purpose of a traffic stop has been effectuated exists. Various jurisdictions have adopted different tests and factors to consider when making this determination. It is unclear from the majority's decision how it determined at what point the purpose of the stop was effectuated.[7] My colleagues note that Morgan had completed the check on the defendant's license, examined the rental agreement and explained the ticket. The majority then concludes that "the record clearly reveals that Morgan's inquiry into other suspected illegal activity came after Morgan's purpose for effectuating the stop had been achieved." As previously noted, the record is not clear that Morgan had finished explaining the ticket to the defendant, although he was in the *process* of explaining the ticket at the time of his request for consent to search the vehicle. If we assume, arguendo, that Morgan had explained the ticket fully, the defendant failed to analyze why we should adopt explanation of the ticket as completing the purpose of a traffic stop rather than other events, such as the return of the driver's license, registration and insurance information or whether the officer had indicated that the driver was free to leave. As noted, several of the Circuit Courts of Appeals have used the return of the driver's paperwork

---

[7] Moreover, we are not presented with a fact pattern in which under *any* *test* Morgan's actions would be unconstitutional.

as a crucial factor in determining whether the traffic stop has been completed. See, e.g., *United States* v. *Gonzalez-Lerma,* supra, 14 F.3d 1479. It is not clear what standards and type of rule are adopted by the majority; that is, whether a bright line test rather than a consideration of the totality of the circumstances test is endorsed.

By simply concluding, without analysis, that "[t]he initial purpose of the stop had been achieved" and that Morgan's inquiry "came after [his] purpose for effectuating the stop had been achieved," I believe that the conclusion lacks certainty and will not provide the trial courts with proper guidance for future cases. See, e.g., *State* v. *King,* 249 Conn. 645, 690, 735 A.2d 267 (1999) (*Berdon, J.,* dissenting); *State* v. *Morales,* 232 Conn. 707, 739, 657 A.2d 585 (1995) (*Borden, J.,* concurring); *Mulligan* v. *Rioux,* 229 Conn. 716, 757, 643 A.2d 1226 (1994) (*Berdon, J.,* concurring and dissenting) (important to give clear guidance to trial courts), on appeal after remand, 38 Conn. App. 546, 662 A.2d 153 (1995); *State* v. *Nguyen,* 52 Conn. App. 85, 97, 726 A.2d 119 (1999) (*Lavery, J.,* dissenting), aff'd, 253 Conn. 639, 756 A.2d 833 (2000). I am unable to ascertain from the majority opinion what factors should be considered or what test a trial court should employ when faced with a motion to suppress claiming that a police officer exceeded the scope of a valid traffic stop. I consider these questions, as well as the rationale for the resolution of the issue, to be of critical importance.

Additionally, because the issue was not analyzed or discussed adequately in the defendant's brief, the state did not have a proper opportunity to present its counterarguments. The inadequacy is such that, essentially, the issue of the completion of a traffic stop was not "raised" in the brief.

Our Supreme Court has recently stated: "We long have held that, in the absence of a question relating to

subject matter jurisdiction, the Appellate Court may not reach out and decide [an appeal] before it on a basis that the parties never have raised or briefed. . . . To do otherwise would deprive the parties of an opportunity to present arguments regarding those issues. . . . If the Appellate Court decides to address an issue not previously raised or briefed, it may do so only after requesting supplemental briefs from the parties and allowing argument regarding that issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Dalzell*, 282 Conn. 709, 715, 924 A.2d 809 (2007); see also *Sheff* v. *O'Neill*, 238 Conn. 1, 87–88, 678 A.2d 1267 (1996) (*Borden, J.*, dissenting) (fairness to parties and fact that appellate court more likely to reach proper result if it follows adequate briefing). Accordingly, I believe it improper for us to reach that issue. Because the issue of when the purpose of a traffic stop has been effectuated in Connecticut was not analyzed properly in the briefs and was not supported by the record, I believe it is inappropriate for us to decide this important issue, in effect, sua sponte. See *State* v. *Dalzell*, supra, 717.

## III

I now turn to the other claims raised by the defendant with respect to the trial court's denial of his motion to suppress. Specifically, the defendant argues that (1) even if his consent had been voluntary, it was tainted by a prior unconstitutional search of his person, (2) the state failed to establish that he actually consented to the search of the vehicle, (3) any consent to search was not given voluntarily and (4) any consent to search was obtained by a violation of the Connecticut constitution by the police improperly converting a traffic stop into a criminal investigation. I am not persuaded by the defendant's claims.

A

The defendant argues that even if he had voluntarily consented to the search of his vehicle, any evidence found was tainted as a result of the illegal search of his person that occurred prior to the search of the vehicle. The state contends that this claim was not raised before the trial court. The state further argues that the record is inadequate for review pursuant to the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8]

After carefully reviewing the entire record, I conclude that the issue of whether Morgan improperly conducted a patdown search of the defendant's person was not raised before the trial court. Our Supreme Court has stated: "[B]ecause our review is limited to matters in the record, we will not address issues not decided by the trial court. Practice Book § 4185, [now § 60-5] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 658, 800 A.2d 1160 (2002). I conclude, therefore, that this issue has not been preserved for appellate review.

In the alternative, the defendant requests review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. I also would conclude that the record is inadequate to review the defendant's claim with respect to the issue of Morgan's patdown search of the defendant's person. Consequently, the defendant's claim that the illegal search of his person tainted the subsequent consent to search the vehicle fails to satisfy the first prong of the *Golding* analysis. I would therefore decline to review this claim.

---

[8] I note that the majority, in footnote 11, concludes that this issue was not raised in the trial court and that the record is not adequate for appellate review.

## B

The defendant next argues that the state failed to establish that he actually consented to the search of the vehicle. Specifically, he maintains that "the trial court's determination that the defendant actually consented to . . . Morgan's search of his automobile is unsupported by the facts and is clearly erroneous." He further maintains that there was not an "actual communicative exchange" between himself and Morgan. I am not persuaded.[9]

"A warrantless search is not unreasonable under the fourth amendment to the United States constitution when a person with authority to do so has freely consented. . . . The question of whether a defendant has given voluntary consent to . . . search . . . is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the . . . search." (Citation omitted; internal quotation marks omitted.) *State* v. *Carcare*, 75 Conn. App. 756, 770–71, 818 A.2d 53 (2003).

The trial court expressly found that "there was no untoward conduct on either the part of . . . Morgan or . . . Sutton. The court finds that there was no threatening, coercive or overpowering behavior exhibited at any time during this incident. . . . The court finds that the defendant voluntarily and knowingly gave permission to have his vehicle searched."[10]

---

[9] The defendant also asserted in his brief that "[i]f any 'consent' were established, at most it authorized Morgan only to check for some beer on the passenger seat floor." He also stated in his brief that "Morgan chose to interpret the defendant's cryptic reply to mean that Morgan could search the entire car for anything illegal."

To the extent the defendant claims on appeal that Morgan exceeded the scope of the consent given by the defendant, I would decline to review such a claim on the basis of an inadequate brief. See, e.g., *State* v. *John G.*, supra, 100 Conn. App. 355 n.2.

[10] During cross-examination, Morgan acknowledged that he did not record the defendant's response verbatim in his report. Specifically, he testified: "I did not quote him. It just says that he just had some beer on the floor

When asked if there was anything illegal in the vehicle, the defendant indicated that there was some beer on the floor and invited Morgan to search the vehicle to check the veracity of his response. This invitation was made in response to Morgan's inquiry and not a demand for access to search the interior of the vehicle. Although Morgan did not inform the defendant that he was free to refuse to respond to this inquiry, that warning is not mandatory or a prerequisite to a voluntary consent. See *State* v. *Van Der Werff*, 8 Conn. App. 330, 341, 513 A.2d 154, cert. denied, 201 Conn. 808, 515 A.2d 380 (1986).[11] In short, the record reveals nothing coercive about the manner in which Morgan interacted with the defendant.

Additionally, the court found that Morgan inquired whether there was any illegal substance inside the vehicle and that the defendant responded to that inquiry by granting Morgan permission to search the interior for contraband. In other words, I reject the defendant's assertion that there was no communicative exchange between him and Morgan.

C

The defendant next argues that any consent to search was not given voluntarily. He specifically contends that

near the passenger's seat, but that I could check if I want to." Nevertheless, Morgan's testimony regarding his inquiry and the defendant's response remained consistent. The defendant's citation to *United States* v. *Caicedo*, 85 F.3d 1184 (6th Cir. 1996), therefore, is misplaced. In *Caicedo*, the arresting officer could not recall at the suppression hearing whether he performed a patdown search before or after he had received consent to search the defendant's backpack. Id., 1189. The United States Court of Appeals for the Sixth Circuit concluded that the District Court's finding that the patdown occurred after the defendant's consent was clearly erroneous. Id.

*Caicedo* is distinguishable from the present case. Although Morgan could not recall the exact words used, his testimony regarding his request as to the defendant's vehicle remained constant. Further, the court, as the trier of fact, was free to credit his testimony.

[11] See footnote 1 of this opinion.

the court failed to consider the totality of the circumstances to ascertain whether his consent was voluntary or coerced and that under the totality of the circumstances, his consent was not free and voluntary. I am not persuaded.

I would decline to reach the merits of the claim that the court failed to consider the totality of the circumstances. The basis for this contention is that, in its memorandum of decision, the court did not address the search of the defendant's person that occurred prior to the search of the vehicle. As I concluded in part III A, this matter was not presented to the trial court, and the record is inadequate to review pursuant to *Golding*.

With respect to the contention that under the totality of the circumstances, the defendant's consent was not free and voluntary, I previously concluded, in part III B, that the court's finding of valid consent, i.e., consent that is free and voluntary, was not clearly erroneous.

D

The defendant next claims that any consent obtained resulted from violation by the police of his rights under the Connecticut constitution. The defendant proposes four "rules" that offer greater levels of protection for the privacy of motorists detained during a traffic stop. Such "rules," the defendant argues, would afford citizens of Connecticut greater protection, pursuant to article first, §§ 7 and 9, of the Connecticut constitution, than the fourth amendment to the federal constitution. I am not persuaded.

The defendant requests that this court adopt, as part of our state constitutional jurisprudence, one of the following "rules" in order to protect adequately the privacy of motorists detained during a traffic stop. "First, the defendant proposes a rule under which an officer may not ask for consent to search a car unless

the officer has a reasonable and articulable suspicion of illegal activity. A citizen would be free to leave as soon as the officer has achieved the traffic enforcement purpose of the initial stop and detention—unless the police had reasonable and articulable suspicion of criminal activity to justify extending the stop to investigate further. Second, the defendant proposes a rule under which an officer performing traffic duty must inform a motorist that he is free to leave and free to refuse consent to search as a prerequisite to obtaining consent to search a car detained for a mere motor vehicle infraction. Third, the defendant proposes a rule that the state must show any 'exchange' between a police officer clearly and unambiguously supports the conclusion that the motorist actually agreed to a car search and to its purpose. Fourth, the defendant proposes a rule holding the state to an enhanced burden of proof in establishing voluntary consent where it is obtained during a traffic stop."[12]

At the outset, I conclude that the defendant failed to preserve the state constitutional claims that he raises on appeal. The defendant also requests *Golding* review of his state constitutional claims. See *State* v. *Golding*, supra, 213 Conn. 239–40. I conclude that he has failed to satisfy all four prongs of that test.

[12] With respect to his third and fourth proposed rules, the defendant has not adequately briefed these issues. Other than mentioning them at the outset of his briefing, the defendant has failed to provide any discussion of why we should adopt these proposed rules. As stated by our Supreme Court: "We repeatedly have emphasized that we expect counsel to employ [the analysis required by *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992)] [i]n order to [allow us to] construe the contours of our state constitution and [to] reach reasoned and principled results. . . . When a party fails to analyze these factors separately and distinctly, [w]e have made clear that . . . we are not bound to review the state constitutional claim." (Internal quotation marks omitted.) *State* v. *Dalzell*, supra, 282 Conn. 722; see also *State* v. *Vega*, 259 Conn. 374, 384 n.15, 788 A.2d 1221 (Supreme Court declined to reach merits of state constitutional claim because it was inadequately briefed pursuant to *Geisler* standard), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

### 1

The defendant's first proposed rule is that a police officer be prohibited from asking for consent to search once the initial purposes of the stop have been achieved. He directs our attention to other states that have adopted such a rule.[13] The fatal flaw with this argument, however, is that the record in the present case is unclear as to whether the initial purposes of the stop were achieved. See part II of this opinion. Given the uncertain status in the record of whether the purpose of the stop had been achieved, I conclude that the defendant has failed to satisfy the first prong of *Golding*, and, therefore, this claim must fail.

### 2

The defendant's second proposed rule is that the defendant's consent "must be knowledgeable." Specifically, he asks this court to "mandate that police conducting mere traffic stops follow set procedures to avoid confusion and possible abuse of authority."[14] I decline the defendant's invitation to require such a rule.

At the outset, I reiterate that it is unclear, legally and factually, as to whether the traffic stop actually was

---

[13] The defendant cites to the following cases in support of his argument: *State* v. *Quino*, 74 Haw. 161, 840 P.2d 358 (1992), cert. denied, 507 U.S. 1031, 113 S. Ct. 1849, 123 L. Ed. 2d 472 (1993); *Commonwealth* v. *Torres*, 424 Mass. 153, 674 N.E.2d 638 (1997); *State* v. *Fort*, supra, 660 N.W.2d 415; *State* v. *Carty*, 170 N.J. 632, 790 A.2d 903 (2002); and *O'Boyle* v. *State*, 117 P.3d 401 (Wyo. 2005).

[14] The defendant further argues that we set forth a rule requiring an officer to provide prophylactic warnings, similar to those established in *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Specifically, he suggests the following language: "The traffic stop is now over. You are free to go. However, I would like to have your permission to search your car for [specify object of search]. You do not have to consent to a search." If the motorist in fact consents, the officer would then confirm by stating, "[w]ith your consent, I will now search your car for [specify object of search]."

completed at the time of Morgan's inquiry. Second, Morgan did not ask to search the vehicle; he merely inquired as to whether there was anything illegal in the vehicle. It was the defendant who offered Morgan the opportunity to search the interior of the vehicle. The facts and circumstances of this case, therefore, do not provide an adequate record for the creation of the state constitutional rule proposed by the defendant.

Additionally, our Supreme Court expressly has stated on several occasions that the validity of a consent to search is to be determined by the *totality of the circumstances* and that *no one factor is controlling*. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 57, 901 A.2d 1 (2006) (no one factor controlling on issue of voluntariness), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). If we were to accept the defendant's second proposed rule, we would, in effect, be disregarding that precedent because we would focus solely on the fact that Morgan did not apprise the defendant of his right to refuse to allow the search. In other words, we would abandon our Supreme Court's instruction to consider the totality of the circumstances with respect to the issue of consent. I would conclude, therefore, that this claim must fail.

I respectfully dissent.